IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERONICA GALES SHORT
   *Plaintiff*,

   v.

NANCY A. BERRYHILL
   *Defendant*

Civil Action No. ELH-18-2714

**MEMORANDUM OPINION**

In this employment discrimination case, Veronica Gales Short, a former employee of the Social Security Administration ("SSA"), filed suit against Nancy A. Berryhill, the Acting Commissioner of SSA, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"). ECF 1 ("Complaint"). Plaintiff appended multiple exhibits to the Complaint. ECF 1-2 to ECF 1-10.[1]

Short, an African-American female, alleges that she was discriminated against on the basis of race (Claim 1); subjected to a hostile work environment (Claim 2); retaliated against for filing an Equal Employment Opportunity ("EEO") complaint concerning discrimination and harassment (Claim 3); and was constructively discharged (Claim 4).[2]

Defendant has moved to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). ECF 6. The motion is supported by a memorandum (ECF 6-1) (collectively, the "Motion") and one exhibit, consisting of two lengthy

---

[1] The Court may consider exhibits attached to and incorporated in the complaint. *Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 618 (4th Cir. 1999).

[2] Plaintiff refers to each count as a "claim." I shall use her nomenclature.

documents. ECF 6-2.[3] Plaintiff opposes the Motion. ECF 7 ("Opposition"). Defendant has replied. ECF 9.

No hearing is necessary to resolve this matter. *See* Local Rule 105.6. For the reasons that follow, I shall construe the Motion (ECF 6) as one to dismiss under Fed. R. Civ. P. 12(b)(6). And, I shall grant the Motion.

## I. Factual Background

Short joined SSA's Office of Disability Policy ("ODP") on September 28, 2014. ECF 1, ¶ 11; *see also* ECF 6-2 at 5. In July of 2015, she was transferred to the Office of Medical Policy ("OMP"), where she worked as a GS-12 Social Insurance Specialist. ECF 6-2 at 5-6.[4] In that role, Short's job encompassed updating and revising the Program Operations Manual System ("POMS") for disability appeals. *Id.* at 7. The POMS instructs SSA employees and state agencies with respect to processing claims for Social Security benefits. *Id.* In addition, Short also wrote model responses to claim inquiries from across the country. *Id.*

As noted, Short is an African-American female. ECF 1, ¶ 10. On or about March 21, 2016, Joseph Kevin Parmer, a Caucasian male, became Short's first-line supervisor. *Id.* ¶ 13. He joined SSA in 2001, and has served in a supervisory capacity since 2008. ECF 6-2 at 123. At the time he managed Short, Parmer was a GS-14 Supervisory Social Insurance Specialist. *Id.*

---

[3] ECF 6-2 consists of SSA's Final Agency Decision ("FAD"), dated August 2, 2018 (ECF 6-2 at 1-27) and SSA's Report of Investigation ("ROI"), dated May 17, 2018. *Id*. at 28-284. The investigation was conducted between October 30, 2017, and May 17, 2018.

[4] In her Complaint, plaintiff states that she was employed at ODP from September 28, 2014, until she resigned as a GS-13 Social Insurance Specialist on December 14, 2017. ECF 1, ¶ 11. However, as recounted in the Decision, Short was transferred from ODP to OMP in July 2015. *See* ECF 6-2 at 6. She was also demoted from a GS-13 to a GS-12 at that time. *Id.* Notably, in paragraph 12 of her Complaint, Short refers to being employed at OMP, not ODP. ECF 1, ¶ 12.

Parmer managed eight employees; all are female and five are African-American. *Id.* at 124. Parmer's supervisor was Cheryl A. Williams, the Director of the OMP, who is an African-American female. *Id.* at 38.

Plaintiff received an appraisal of "Successful Contribution" on her 2016 performance review. ECF 1, ¶ 15. Yet, in or about April 2017, Parmer began to "frequently" criticize her work. *Id.* ¶ 14. On April 28, 2017, Parmer placed Short on a Performance Assistance ("PA") plan, "without explaining to her how and when her performance became deficient[.]" *Id.* ¶ 15; *see* ECF 6-2 at 39.

Short's PA plan was outlined in a seven-page document. ECF 6-2 179-86. It described the job expectations for Short's position and detailed specific issues with her performance. *Id.* at 179-82. In addition, the document contained a list of trainings that plaintiff could attend in the form of Video on Demand ("VOD") training and supplemental reference material. *Id.* at 183-84. Short's PA plan was originally scheduled to end on May 25, 2017. ECF 1, ¶ 16. However, Parmer extended the plan another thirty days, through June 8, 2017. *Id.*

In both May and June 2017, Short sought permission from Parmer to attend a one-week course needed to maintain her certification as a Level 1 Contract Technical Representative ("COTR"). *Id.* ¶ 17; ECF 6-2 at 104. Parmer denied her requests. ECF 1, ¶ 17. Short asked to attend a one-day telephonic COTR training in August 2017. *Id.* ¶ 18. Again, Parmer rejected her request, instructing her to focus instead on her assignments. *Id.* According to Parmer, the COTR courses were not related to Short's job duties at OMP. ECF 6-2 at 130.

On September 15, 2017, Short received an email from Parmer setting a meeting for September 19, 2017, to discuss her job performance. *Id.* at 39. Parmer told Short that she could have a union representative present at the meeting. *Id.* As planned, Parmer met with Short and

Carole Brown, Short's union representative. ECF 1, ¶ 21. During the meeting, plaintiff alleges that Brown told Parmer that the PA was improper "as there was no level of assessment as required by union contract." *Id.*

Short was put on the second and final tier of the employee performance plan, known as an Opportunity to Perform Successfully ("OPS") plan. ECF 1, ¶ 20; ECF 6-2 at 187. In the OPS document, Parmer referenced the PA plan and said: "I made a senior analyst and myself available to provide counseling, instruction, and advice[.]" ECF 6-2 at 187. Further, he said: "We met several times during the PA where I reviewed [plaintiff's] work products and provided specific instructions and guidance." *Id.* However, Parmer noted that Short "continue[d] to need extensive feedback with [her] work products regarding accuracy, analysis, and formatting." *Id.* Parmer also observed that since the conclusion of the PA plan, Short's "performance has not improved[.]" *Id.* at 188.

As with the PA, the OPS document identified specific instances where Short had not met expectations. *Id.* at 188-91. It also provided that Short would meet bi-weekly with her mentor and monthly with Parmer. *Id.* at 191. The OPS plan was effective for 120 days, after which Short could be reassigned, demoted, or removed if her performance did not improve. *Id.* at 187; *see* ECF 1, ¶ 20.

On September 20, 2017, Parmer completed a performance evaluation for Short. ECF 1, ¶ 23; ECF 1-4. He assigned her an overall rating of "Not Successful," giving her a score of three out of five in the areas of "Interpersonal Skills" and "Participation" and a score of one in the areas of "Demonstrates Job Knowledge" and "Achieves Business Results." ECF 1-4.

According to plaintiff, Parmer's "negativity towards her escalated" after she was placed on the OPS plan. ECF 1, ¶ 22. In her view, Parmer "continually found excessive or unnecessary fault

with [her] work, marking up her assignments and requiring extensive edits to her work." *Id.* ¶ 24.

Parmer's "non-substantive" feedback "required her to completely change her writing to fit his

stylistic preferences." *Id.* Parmer also failed to give Short regular reports on her progress while

she was on the OPS plan. *Id.* ¶ 25.

Short requested EEO counseling on September 18, 2017. ECF 6-2 at 2, 53, 97. Short met

with an EEO counselor on September 26, 2017. *Id.* at 53. SSA informed Parmer of Short's EEO

activity on October 4, 2017. *Id.* at 60. Short filed an EEO complaint on October 30, 2017, lodging

claims of racial discrimination, hostile work environment, and retaliation against Parmer. *Id.* at

49-51.

Short received an email from Parmer on November 8, 2017, which "indicated to Ms. Short

that the only way [Parmer] would address questions she had about assignments would be if she

submitted questions to him in writing prior to scheduled meetings, rather than asking questions as

they arose." ECF 1, ¶ 26. The email stated, ECF 1-2 at 31:

> Veronica,
>
> During our meeting today, we discussed my comments 1-13 of 70, on your draft of
> POMS DI 12095, and the possible resolutions. We also discussed the need for
> clarity within the instructions, as well as organization so the users will have the
> necessary information at the appropriate time to carry out subsequent steps (i.e.,
> our discussion about the order of instructions for individuals that need an
> interpreter). We also discussed the context of your instructions and that actions need
> to be clear so there is no ambiguity on what steps or policy applies (i.e., our
> discussion regarding the signature of the SSA-773). Please be mindful of the
> audience for these instructions and how they will be used by the field offices.
>
> As an analyst, you should first attempt to provide a resolution to the comment, and
> bring that for discussion rather than asking what the proper resolution should be as
> we review the comment. As discussed, please address and make the appropriate
> revisions to comments 1-13 from our meeting, as well as the remaining comments
> in the document. I have scheduled a meeting on 11/13 from 1:30-2:30 to discuss
> your resolutions and revisions.

On or about November 16, 2017, Parmer assigned Short to work on a project revising a disability form. ECF 1, ¶ 27; ECF 6-2 at 42. Mary Quatroche, a Senior Policy Analyst at ODP, was also involved in the project. Short did not want to work with Quatroche, whom she claims "had previously made unfounded accusations" against her. ECF 1, ¶ 27. Short also believed that the project was outside the scope of her OPS plan. *Id.* ¶ 28. Short expressed these concerns to Parmer, but he insisted that she take on the new assignment. *Id.* ¶¶ 28, 29.

On November 30, 2017, Parmer sent Short an email to schedule a one-hour check-in for December 5, 2017. *Id.* ¶ 30; ECF 6-2 at 203. Short responded: "I have a meeting during the time frame you have proposed." ECF 6-2 at 202. In reply, Parmer wrote: "I will reschedule for the same day from 2:00-3:00." *Id.* Short answered, stating that she also had a meeting during that time as well. *Id.* at 205. Parmer then asked, "What times are you available Tuesday?" *Id.* at 207. Short responded: "After 3:30 PM should work for me." *Id.* at 209. Four minutes later, Parmer wrote: "Are you in meetings from 11:00-12:00 or 1:00-2:00? Are you planning to attend the meeting with Michele from 9:30-10:00?" *Id.* at 211. Short responded, "Yes." *Id.* at 213. Parmer then asked, "Is that yes to both?" *Id.* at 215. Short answered: "My response is affirmative (yes) to all of the question[s]." *Id.* at 218.

The same day, November 30, 2017, Parmer sent the following email to Short, *id.* at 221:

> As previously stated, this is not a replacement of the forum by which you receive the necessary guidance, but rather an organized approach to targeting the questions you have, and then expand on them during our conversation. You will receive feedback through multiple forums, such as written comments, by telephone, through email, or in person discussions. All the feedback that you receive is intended to produce a document that will benefit the users.
>
> Earlier I was trying to set up a meeting so we can discuss your questions and current document, but you stated you were not available for the day. Is the conflicting meeting the HMD call from 10:00- 3:30?

Short responded, *id.* at 222:

We have exhausted your question regarding my availability on December 5, 2017. From 10:44 AM through 11:32 AM and again at 3:05 PM, I have answered and addressed your numerous emails. The email response (11:32 AM) indicated that I answered in the affirmative to your continued questions directed that appeared to be simple in form. I responded to you that I am available after 3:30PM on December 5, 2017. However, you did not establish/issue a meeting invitation, but you requested that I submit questions regarding the discussion for which you did not extend an invitation or meeting request. The numerous aforementioned emails, appear to indicate an urgent need to re-schedule the discussion meeting from November 28, 2017. To that end, I have responded in kind to you and I consider your numerous emails on the same subject as harassment and retaliation for my pursuant of the EEO filed. Thank you for your attention this matter.

On December 4, 2017, Parmer sent the following email to Short, *id.* at 221:

Provide me with information as to what meeting you are attending on December 5, 2017, from 10:00 until 3:30. I will decide if it is a priority for you to attend that meeting or if you should forego that meeting and attend that one I schedule. Send this to me by noon today.

(Emphasis in original).

In response, Short directed Parmer to her email of November 30, 2017, and reiterated that she perceived his frequent emails to constitute retaliation. *Id.* The same day, Parmer wrote back, *id.* at 224:

There were multiple inquires because it was never made clear to me why you were unavailable for 5 ½ hours of the workday on 12/5. Each subsequent meeting inquiry was declined without providing any details as to the reason for the conflict or the meeting that was to be attended. As a supervisor, I need to know the availability of staff members. My goal was to designate a mutual time for us to meet and discuss your ongoing work on DI 12095 and also answer any questions you had. I am establishing these meetings to help assist you complete your assignments, move your workload along, and help you perform successfully as outlined in the OPS.

As we have previously discussed, work related to contract officer (or COTR) duties are not part of your priority workload. I believe a better use of time would be to focus on your priority workloads so you can perform successfully, rather than listening in to the HMD meeting. I am offering my assistance to review your document and answer your questions tomorrow from 2:00-3:00.

On December 7, 2017, Short notified Williams of her intent to resign from SSA.

ECF 6-2 at 231. She stated that she was leaving "under duress." ECF 1-1 at 35. Short formally

resigned on December 14, 2017. ECF 1, ¶ 33. When Short resigned on December 14, 2017, she amended her EEO complaint to include a claim for constructive discharge. *Id.* ¶ 33; *see* ECF 6-2 at 3.

Parmer prepared a final evaluation of Short, dated December 14, 2017. ECF 1, ¶ 34. Parmer gave Short an overall rating of "Successful Contribution," despite her not having completed the OPS plan. ECF 1-5.

An investigation followed Short's resignation, culminating in a Final Agency Decision ("FAD" or "Decision"), issued on August 2, 2018. ECF 6-2 at 2. It was accompanied by a Report of Investigation ("ROI"), dated May 17, 2018, which is over 250 pages in length. *Id.* at 28-284. The FAD concluded that Short could not establish a prima facie case for retaliation because her PA and OPS plans occurred before she filed her EEO complaint and before Parmer learned of her EEO activity. *Id.* at 21. The Decision also rejected Short's hostile work environment claim on the ground that "there is no direct evidence of discriminatory harassment[.]" *Id.* at 22. It likewise dismissed her disparate treatment claim, finding no evidence of discriminatory animus and that SSA had a legitimate, non-discriminatory reason for its actions, *i.e.*, plaintiff's poor job performance. *Id.* at 23-24. And, the Decision rejected Short's claim for constructive discharge, concluding that management made no effort to force her to resign. *Id.* at 25.

This lawsuit followed on September 30, 2018. ECF 1.

## II.    Standard of Review

As noted, defendant's Motion is styled as a "Motion to Dismiss Or, In the Alternative, For Summary Judgment." ECF 6. A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[5]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.*  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate

---

[5] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub. nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly

denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Short has not filed an Affidavit under Rule 56(d). Nor does she avoid defendant's arguments for summary judgment. To the contrary, she addresses them head on in her Opposition,

asserting that there are numerous genuine disputes of material fact. *See* ECF 7 at 2. That she captioned her motion as an "Opposition to Government's Motion for Judgment on The Pleadings" further militates in favor of treating defendant's motion as one for summary judgment. *Id.* at 1.

Nonetheless, plaintiff argues it would be a "manifest injustice" to short-circuit discovery. *Id.* at 6. She contends that discovery is necessary to discern whether Parmer acted with racial animus and whether he complied with the protocol set forth in the PA and OPS plans. *Id.* at 2. And, she maintains that discovery is necessary to obtain information from key witnesses, such as Carole Brown, Short's union representative, and Shari Watts, Short's mentor. *Id.* at 3-4. Discovery is also necessary, she insists, to unearth other instances of harassment not included in SSA's internal investigation. *Id.* at 6.

This is a close call. To be sure, there is an extensive administrative record in this case. The FAD and ROI contain substantial documentation of plaintiff's claims of discrimination; the underlying materials, including email exchanges, the improvement plans, and Short's evaluations; affidavits from Parmer and Short; and SSA's resolution of Short's claims at the agency level. *See* ECF 6-2 at 28-284. But, none of those investigative proceedings took place in an adversarial context. *See* 29 C.F.R. § 1614.108 (describing inquisitorial nature of investigation process); 29 C.F.R. § 1614.302 (noting that a complainant in an employment discrimination action is not entitled to a hearing). Notably, Short did not have the opportunity to depose Parmer during the investigation. *See McCray*, 741 3.d at 485 (holding that district court should have allowed the plaintiff, who alleged racial discrimination, to depose her supervisors before resolving defendants' motion for summary judgment). And, of course, to the extent credibility is an issue, such an issue cannot be decided on summary judgment. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an

opportunity to confront and cross-examine adverse witnesses."); *Elm Grove Coal Co. v. Dir., O.W.C.P*, 480 F.3d 278, 301 (4th Cir. 2007) (extolling the virtues of cross-examination). Thus, I will consider defendant's Motion under Fed. R. Civ. P. 12(b)(6), without converting it to a summary judgment motion under Rule 56.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 2019 WL 1105179, at *3 (4th Cir. Mar. 11, 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do

not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10, 135 S. Ct. 346, 346 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'" Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*,

___ U.S. ___, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Vol. Fire Dep't.*, 684 F.3d at 467.

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In her Complaint, plaintiff references various portions of the FAD and ROI, which she attached as exhibits. These include her formal EEO Complaint (EEO 1-1), the cover material for the Decision (ECF 1-2) and the ROI (ECF 1-3), and her performance reviews (EFC 1-4; ECF 1-5). Defendant submitted the Decision and the ROI with her Motion, in their entirety. ECF 6-2. Plaintiff has not contested the authenticity of defendant's exhibit. Indeed, she cites to it repeatedly in her Opposition. *See, e.g.*, ECF 7 at 3 (citing ECF 6-2 at 179), *id.* at 4 (citing ECF 6-2 at 94); *id.* at 6 (citing ECF 6-2 at 50). Accordingly, I may consider these documents in analyzing various contentions presented by the parties, without converting defendant's motion to one for summary judgment.

## III.  Discussion

### A.  Title VII

Relying on Title VII, plaintiff lodges claims against the SSA for racial discrimination based on disparate treatment, hostile work environment, retaliation, and constructive discharge. ECF 1. Defendant has moved to dismiss each claim under Fed. R. Civ. P. 12(b)(6). ECF 6.

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. It also bars

retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for

participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3; *see e.g., Young v.

United Parcel Serv., Inc.*, 575 U.S. ____, 135 S. Ct. 1338, 1344 (2015); *Perkins v. Int'l Paper Co.*,

___ F.3d ___, ___, 2019 WL 4018288, at *5 (4th Cir. Aug. 27, 2019); *Ray v. Int'l Paper Co.*, 909

F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v.

City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409,

416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en

banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

   Title VII's prohibitions apply to private sector employees as well as federal employees.

*Nielsen v. Hagel*, 666 F. App'x 225, 227 (4th Cir. 2016) (citing 42 U.S.C. § 2000e-16(a)).[6] Before

filing suit under Title VII, however, a plaintiff must exhaust administrative remedies. *See

Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees),

*superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820,

832 (1976) (federal employees); *see also McCray v. Md. Dep't of Transp.*, 662 F. App'x 221, 224

(4th Cir. 2016). Notably, "[t]he administrative remedies available for federal employees are

significantly broader" than those available to employees in the private sector. *Laber v. Harvey*,

438 F.3d 404, 416 (4th Cir. 2006) (en banc). *See* 42 U.S.C. § 2000e-16(c) (setting forth the

---

[6] Title VII initially did not protect federal employees. *See* 42 U.S.C. § 2000e(b) (excluding the United States from the definition of "employer"). In 1972, however, Congress amended Title VII to provide that a federal employee who has exhausted her administrative remedies "may file a civil action as provided in section 2000e-5 of this title" against the "head of the department, agency, or unit, as appropriate." 42 U.S.C. § 2000e-16(c); *see Bullock v. Napolitano*, 666 F.3d 281, 283-84 (4th Cir. 2012), *cert. denied*, 568 U.S. 882 (Oct. 1, 2012).

conditions under which a federal employee may initiate a civil suit under Title VII). There is no contention here as to exhaustion.[7]

In general, a plaintiff *at trial* "may establish a discrimination claim under Title VII through two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young*, 135 S. Ct. at 1345 (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Because there is no direct evidence of discrimination in this case, I turn to review the *McDonnell Douglas* proof scheme. However, reference to the avenues of proof merely serves to inform a court's evaluation of a motion to dismiss or for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that "a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas Corp. . . .*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir.

---

[7] Exhaustion under Title VII is not jurisdictional. *See Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019). Rather, it is a "claim-processing rule[] that must be timely raised to come into play." *Id.* at 1846.

18

2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a prima facie claim of racial discrimination under *McDonnell Douglas*, the plaintiff must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc*., Inc., 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)); *see also Matias v. Elon Univ.*, __ F. App'x __, 2019 WL 3302345, at *3 (4th Cir. July 22, 2019); *Rayyan v. Va. Dep't of Transp*., 719 F. App'x 198, 203 (4th Cir. 2018).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of

illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has

been established.  *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*.  *See Burns*, 96 F.3d at 731.  At the motion to dismiss stage, a plaintiff need not establish a prima facie case of discrimination under *McDonell Douglas*.  In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."  The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."  *Id.* at 511.  Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, ___ U.S. ___, 136 S. Ct. 1162 (2016).

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544.  *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).  On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309. On the other hand, in *Twombly*, the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ." *Iqbal*, 556

21

U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" Thus, the question at the motion to dismiss stage is whether the plaintiff has stated "a plausible claim for relief under Title VII . . . ." *Ciociola v. Balt. City Bd. of Sch. Comm'rs*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

**B. Claim 1: Racial Discrimination**

Plaintiff makes four allegations to support her claim that SSA discriminated against her on the basis of race. First, she asserts that Parmer placed her on the PA plan without explaining why her performance was deficient. ECF 1, ¶ 39. Second, he placed Short on a PA plan, but not Tessa Walker, a white employee. *Id.* ¶ 40. Third, Parmer restricted Short's ability to ask questions about assignments, a limitation he did not impose on Walker. *Id.* ¶ 41. Fourth, Parmer assigned plaintiff to work on an "unfamiliar project" during the OPS plan that entailed working with Quatroche, "a white female who had made prior unfounded accusations against Ms. Short[.]" *Id.* ¶ 42.

In the Motion, defendant argues that plaintiff's racial discrimination claim fails because she alleges only "petty frustrations" and therefore cannot plausibly allege an adverse employment action. ECF 6-1 at 9. In addition, defendant contends that the Complaint's conclusory allegations that Parmer treated Short and Walker disparately are insufficient to state a claim for racial discrimination. *Id.* at 16-18. I agree.

An adverse employment action is an action that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle,* 650 F.3d

at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  In other words, the action must "'adversely affect[] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)); *see  Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999) ("[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.").  Thus, "[a]n action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of her employment, is not an adverse employment action." S*priggs v. Public Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).

Here, viewing the facts alleged in the Complaint most favorably to Short, she fails to allege an adverse employment action.  Thus, she has not stated a claim.

As evidence of discrimination, plaintiff points to her supervisor's frequent criticism of her work, his harsh formal evaluations, and his refusal to answer her questions.  ECF 1, ¶¶ 14, 22.  However, the Fourth Circuit has instructed that reprimands and low performance reviews, without more, do not constitute an adverse action.  *See Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015) (holding that, for the purposes of a Family Medical Leave Act claim, "neither the written nor the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline"); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997) (holding that an employer's "yelling at [the plaintiff] during [a] meeting" did not rise to the level of an adverse employment action for Title VII purposes); *Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 461 (D. Md. 2002) ("[D]iscipline, without

evidence that the verbal reprimands or that a counseling letter could lead to further disciplinary action, such as termination, does not constitute an adverse employment action."). The Complaint offers no allegations concerning the terms or conditions of plaintiff's employment. Thus, these actions cannot serve as the basis for plaintiff's discrimination claim.

Plaintiff also alleges, as evidence of discrimination, that she was placed on an unfamiliar project with a colleague whom she disliked. ECF 1, ¶¶ 27-29. But here too, reassignments or changes to the employee's job responsibilities are not materially adverse unless they have a "'significant detrimental effect' on his opportunities for promotion or professional development." *James*, 368 F.3d at 376 (citation omitted); *see id.* (holding that an employee's dissatisfaction with a reassignment is not an actionable adverse action); *Boone*, 178 F.3d at 255-56; *Taylor v. Burwell*, No. 13-cv-1998-PWG, 2014 WL 3547337, at *6 (D. Md. Jul. 16, 2014) ("[T]emporary changes to an employee's workload or to the tasks he is assigned do not constitute an adverse employment action."). Indeed, work would grind to a halt if every employee saddled with a new task or project could sue under Title VII. *See Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985) ("Every job has its frustrations, challenges and disappointments; these inhere in the nature of work."). Because Short fails to explain how this assignment materially impacted her job responsibilities, pay, or benefits, it cannot support her discrimination claim.

Finally, plaintiff points to her placement on employee improvement plans to support her discrimination claim. ECF 1, ¶¶ 39-40. But, "'a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" *Dortch v. Cellco P'ship*, 770 F. App'x 643, 647 (4th Cir. 2019) (quoting *James*, 368 F.3d at 377); *accord Jensen-Graf v. Chesapeake Employer's Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015); *Fletcher v. Ross*, No. 17-cv-3419-TDC, 2018 WL

6031173, at *5 (D. Md. Nov. 16, 2018); *Silah v. Burwell*, 244 F. Supp. 3d 499, 517 (D. Md. 2017);

*Smith v. Vilsack*, 832 F. Supp. 2d 573, 583 (D. Md. 2011). Short does not "allege that she received

lower pay, was demoted, was passed over for a promotion, failed to receive a bonus, or given

significantly different responsibilities because she was placed on" either the PA or OPS plans.

*Jensen-Graf*, 616 F. App'x at 598. Therefore, plaintiff has not—and cannot—state a claim for

discrimination because none of the actions alleged in the Complaint rise to the level of an

actionable adverse employment action.

Even assuming, *arguendo,* that plaintiff suffered an adverse employment action, her

discrimination claim nonetheless fails on the fourth prong—that she was treated differently from

similarly-situated white employees.

As noted, while a complaint need not plead facts sufficient to establish a prima facie case

of discrimination, it must allege facts to support a plausible inference of disparate treatment.

*Woods*, 855 F.3d at 648. To do so, the plaintiff need not provide allegations comparing her

treatment to a similarly-situated white comparator. *See Bryant v. Aiken Reg'l Med. Ctrs., Inc*., 333

F.3d 536, 545-46 (4th Cir. 2003). But, "[w]here a plaintiff attempts to rely on comparator evidence

to establish circumstances giving rise to an inference of unlawful discrimination," the plaintiff

must demonstrate that the comparator is similarly situated in all relevant respects. *Swaso v.*

*Onslow Cty. Bd. of Educ*., 698 F. App'x 745, 748 (4th Cir. 2017).

Plaintiff must allege facts showing she is "similar in all relevant respects" to the

comparator, including "that the employees 'dealt with the same supervisor, [were] subject to the

same standards and . . . engaged in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment of them for it.'"

*Haywood v. Locke*, 387 F. Appx 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp*., 964

F.2d 577, 583 (6th Cir. 1992)); *see Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014).

Of course, the comparison "'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'" *Haynes*, 922 F.3d at 223-24 (citation omitted); *see Irani v. Palmetto Health*, 767 F. App'x 399, 420 (4th Cir. 2019) (per curiam).  Nevertheless, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'"  *Swaso*, 698 F. App'x at 748 (quoting *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)); *see Farrelly v. Acme Markets, Inc.*, Civil Action No. CCB-08-1992, 2011 WL 778583, at *7 (D. Md. Feb. 10, 2011).  Thus, a complaint's conclusory assertions that a white co-worker was treated differently are insufficient to nudge a racial discrimination claim across the line from conceivable to plausible.  *See Swaso*, 698 F. App'x at 748; *Sanchez v. Whole Foods Mkt.*, No. 18-cv-3106-GJH, 2019 WL 3717771, at *4 (D. Md. Aug. 5, 2019); *Bowen v. Md. Dept. of Pub. Safety and Corr. Servs.*, No. 17-cv-1571-RDB, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).

Plaintiff relies on comparator evidence to assert her claim of racial discrimination.  The Complaint alleges that "Mr. Parmer put Ms. Short on a PA, but not Ms. Tessa Walker, a white employee," and that "Mr. Parmer did not restrict Ms. Tessa Walker's ability to ask questions about assignments." ECF 1, ¶¶ 40-41.  Her factual allegations as to the differing treatment of a Caucasian employee ends there, however.  Short does not allege that she and Walker had similar job duties and positions, similar abilities, or dealt with the same supervisor.  Thus, there is no basis to conclude that there are "common features between the individuals to allow [for] a meaningful

comparison." *Haywood*, 387 F. App'x at 360 (citations omitted). Instead, the court is left to speculate as to whether Walker is, in fact, a fair comparator for Short because only speculation can "fill the gaps in her complaint." *McCleary-Evans*, 780 F.3d at 587.

Ordinarily, I would afford an opportunity for plaintiff to amend her suit as to the comparator claim. But, as noted, plaintiff has not alleged a cognizable adverse employment action. As a result, the deficiencies in regard to the disparate treatment claim are of no moment. Therefore, I shall dismiss Claim 1.

## C. Claim 2: Hostile Work Environment

Plaintiff alleges that she was subjected to a hostile work environment based on the same events underlying her retaliation claim. In particular, plaintiff alleges that the following incidents created a hostile work environment, ECF 1 at 7-8:

(1) Parmer put Short on PA and OPS plans without explanation;

(2) Parmer assigned Short to work with Quatroche;

(3) Parmer refused to answer Short's questions about her work, thereby preventing her from successfully completing her OPS plan; and

(4) Parmer sent Short "a series of aggressive emails on December 5, 2017, asking for her availability to meet."

An employer violates 42 U.S.C. § 2000e-2(a)(1) "by requiring an African-American employee to work in a racially hostile environment." *Boyer-Liberto*, 786 F.3d at 277; *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986). A hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment[.]'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

To state a claim under Title VII for hostile work environment based on race, the plaintiff must allege that there was: "'(1) unwelcome [offensive] conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *see also Evans v. Int'l Paper Co.,* ___ F.3d ___, ___, 2019 WL 4018287, at *5 (4th Cir. Aug. 27, 2019); *Perkins*, 2019 WL 4018288, at *5; *Ray*, 909 F.3d at 667; *Irani*, 767 F. App'x at 416.

Hostile work environment claims may involve "a series of days or perhaps years . . . ." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, for a hostile work environment claim, "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*

To satisfy the second element of a hostile work environment claim, the plaintiff must demonstrate that she was harassed or otherwise discriminated against "because of" her protected class. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (citing *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)). The plaintiff may satisfy this burden by showing that, "but for" her protected class, she would not have suffered discrimination. *Id.* But, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

As to the third element of a hostile work environment claim, a hostile work environment exists under Title VII when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult . . . .'" *Boyer-Liberto*, 786 F.3d at 281 (some quotations and citation omitted) (quoting *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)); *see Harris*, 510 U.S. at 21; *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 158 (4th Cir. 2018). The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *Harris*, 510 U.S. at 21-22; *see E.E.O.C. v. Cent. Wholesalers Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). Thus, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *see Irani*, 767 F. App'x at 416; *Nnadozie*, 730 F. App'x at 158. However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious." *Id.*; *see Harris*, 510 U.S. at 21-22.

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Morgan*, 536 U.S. at 115-17); *see Irani*, 767 F. App'x at 416. But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

The Court stated in *Boyer-Liberto*, 786 F.3d at 278 (citation omitted): "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a

supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *See also E.E.O.C. v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (quoting *Ziskie*, 547 F.3d at 227) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

However, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). And, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted); *see also Boyer-Liberto*, 786 F.3d at 294. Similarly, "complaints premised on nothing more than 'rude treatment by [coworkers]', 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.'" *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (internal citations omitted); *see Nnadozie*, 730 F. App'x at 161-62. Indeed, Title VII does not constitute "a general civility code." *Oncale*, 523 U.S. at 80.

The determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Moreover, "[n]o single factor is dispositive, as [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which

are not fully captured by a simple recitation of the words used or the physical acts performed."

*Sunbelt Rentals, Inc.*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (internal citations and quotation marks omitted).  The objective determination requires the court to "'look[] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the] employee's work performance.'"  *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 304 (4th Cir. 2019) (quoting *Harris*, 510 U.S. at 23).

In this case, plaintiff's hostile work environment claim is based on the performance plan, her supervisor's alleged repeated criticism of her performance, her supervisor's refusal to answer her questions verbally, being assigned to work with Quatroche, and a "series of aggressive emails." ECF 1, ¶¶ 44-48.  These and the other allegations in the Complaint do not amount to severe or pervasive harassment that can support a hostile work environment claim.

The alleged conduct consists primarily of negative job evaluations and curt, annoying, bothersome emails from plaintiff's supervisor.  Courts have declined to find a hostile work environment based on workplace conduct far more egregious than what was alleged here.  *Cf. Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (per curiam) (stating that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "repeatedly harping on a mistake" by the plaintiff, and "unfairly scrutinizing and criticizing" plaintiff's failure to follow directives, fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)); *Vincent v. MedStar S. Md. Hosp. Ctr.*, No. 16-cv-1438-TDC, 2017 WL 3668756, at *9-10 (D. Md. Aug. 22, 2017) (finding plaintiff failed to allege hostile work environment where supervisor yelled at employee, called her "stupid," refused to communicate with her, and restricted her access to the computer system); *Tims v. Carolinas Healthcare Sys.*,

983 F. Supp. 2d 675, 680-81 (W.D.N.C. 2013) (granting motion to dismiss where plaintiff alleged supervisor referred to her as "you people" and "y'all blacks" because "isolated comments do not rise to the level of severity necessary to alter the terms and conditions of employment").

Moreover, plaintiff presents no facts that Parmer's conduct was on account of Short's race, such as racial epithets or derogatory language related to Short being African-American. Without alleging such facts, it is only speculative, not plausible, that her work place was "'permeated with discriminatory intimidation, ridicule, and insult.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21). Given that plaintiff's hostile work environment claim fails as a matter of law, I shall dismiss Count 2 with prejudice.

### D. Claim 3: Retaliation

Plaintiff contends that SSA retaliated against her for filing an EEO complaint. She alleges that she filed her EEO complaint naming Parmer as the individual harassing her on September 18, 2017, and then, two days later, Parmer gave her an unfavorable rating on her performance appraisal. ECF 1, ¶ 54(a)-(c). Further, plaintiff insists that in the wake of her EEO complaint, Parmer "escalated" his "negative behavior and criticism" of Short, *id.* ¶ 54(e); assigned her to work with Quatroche, *id.*; withheld regular progress reports, as required by the Union Contract, *id.* ¶ 54(f); and refused to answer her questions. *Id.* ¶ 54(g).

To state a claim of retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see Strothers*, 895 F.3d at 327; *Guessous*, 828 F.3d at 217; *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).

A plaintiff must first establish that she engaged in protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Fed. Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

The second element is that of an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). That said, "retaliatory actions do have to be 'materially adverse'— such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68). In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

Of import here, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667. The Fourth Circuit has found that "discharge, demotion,

decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Reassignment of job function may also constitute an adverse action. *Young v. Montgomery Cty*., PX-18-2054, 2019 WL 1596992, at *4 (D. Md. Apr. 15, 2019) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998)). But, "[a]bsent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support a claim of discrimination under Title VII." *Boone*, 178 F.3d at 256. At a minimum, the plaintiff must plausibly allege that "the reassignment had some significant detrimental effect on" the employee. *Id*.

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani*, 767 F. App'x at 421. The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Pursuant to the Supreme Court's ruling in *Nassar*, 570 U.S. at 362, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)).

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

In this case, plaintiff alleges that her supervisor retaliated against her in response to her filing of an EEO complaint. ECF 1, ¶ 54. Unquestionably, that was protected activity under Title VII. *Okoli*, 648 F.3d at 223; *Laughlin*, 149 F.3d at 259. However, plaintiff's retaliation claim fails for two independent reasons.

First, as discussed, none of the incidents alleged by Short constitutes adverse employment actions. This is so even under the liberal definition of adverse action applicable to retaliation claims. As Judge Paul Grimm of this Court has noted, even under the "lower bar" applicable to

Title VII retaliation claims, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee AWOL; or issuing a personal improvement plan, an Attendance Warning, a verbal reprimand, a formal letter of reprimand, or a proposed termination." *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013); s*ee also Thorn v. Sebelius*, 766 F. Supp. 2d 585, 603 (D. Md. 2011) (noting that "unwarranted reprimands" such as "letters of counseling" would not dissuade a reasonable employee from engaging in protected activities).

Second, Short's retaliation claim falters on the causation element. Plaintiff avers that she filed her EEO complaint on September 18, 2017. ECF 1, ¶¶ 19, 54. Parmer then put her on the OPS plan on September 19, 2017, and gave her an unsatisfactory rating on her performance review the next day. *Id.* ¶¶ 20, 54. If this timeline were true, the temporal proximity between the filing of the EEO complaint and Parmer placing plaintiff on the OPS plan could satisfy the causality element. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, (2001) (holding that alleging a "temporal proximity" between the protected activity and retaliatory event that is "very close" can satisfy this third element). But it is not.

Plaintiff attached the EEO complaint as an exhibit to her Complaint. *See* ECF 1-1 at 2. It clearly shows that plaintiff lodged her EEO complaint with SSA on October 30, 2017, *i.e.*, *after* the alleged adverse action by SSA. An adverse action that predates the EEO activity cannot serve as a basis for a retaliation claim based on that EEO activity. *See, e.g., Gen. Eng'g & Tech. Support Serv. v. Balt. Gas & Elec.*, No. 18-cv-00124-PX, 2019 WL 4016846, at *6 (D. Md. Aug. 26, 2019) ("Because Plaintiffs [sic] protected activity occurred before Defendants took adverse action, the retaliation claim fails as a matter of law."); *Hunter v. Vilsack*, No. 07-cv-2655-DKC, 2010 WL

1257997, at *11 (D. Md. Mar. 26, 2010); *Middlebrooks v. Winter*, No. 05-3209-WGC–05, 2008 WL 8116107, at *37 (D. Md. Mar. 19, 2008) ("By definition, if the alleged materially adverse action occurred *before* Plaintiff engaged in protected activity, the alleged materially adverse action cannot be classified as *retaliation*.") (emphasis in original), *aff'd*, 333 F. App'x 762 (4th Cir.2009) (per curiam).

Accordingly, plaintiff's retaliation claim fails as a matter of law.

### E.  Claim 4: Constructive Discharge

Plaintiff maintains that she was forced to resign from SSA as a result of Parmer's conduct. In her view, Parmer's refusal to answer her questions unless in writing demonstrated "a desire to see [her] not complete her plan and be terminated."  ECF 1, ¶ 58.  Parmer also perpetuated the intolerable working conditions by denying Short permission to attend COTR trainings.  *Id.* ¶ 59. Plaintiff avers that Parmer's behavior during the PA and OPS plans "caused her extreme emotional distress" and "led her to reasonably believe she would be terminated."  *Id.* ¶ 60-61.  Thus, plaintiff submits that, "faced with certain discharge," she "had no other option but" to resign in order to avoid the negative employment consequences associated with having been fired.  *Id.* ¶¶ 68-69.

A claim of constructive discharge arises when an employee resigns because the "circumstances of discrimination" made the employee's working conditions "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Green v. Brennan*, ___ U.S. ___, ___, 136 S. Ct. 1769, 1776 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)).  Thus, to allege a claim for constructive discharge, the plaintiff must plead first that her working conditions were intolerable and, second, that she resigned because of those conditions.  *Perkins*, 2019 WL 4018288, at *8 (citing *Green*, 136 S. Ct. at 1776).

Regarding the "intolerability" of the work environment, the Fourth Circuit has instructed:

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign. Instead, intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign, . . . that is, whether he would have had no choice but to resign.

*Id.* (internal quotation marks and citations omitted).

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans*, 2019 WL 4018287, at *6 (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995)). "The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.*

Intolerability is a high bar. As the Fourth Circuit emphasized, "difficult or unpleasant working conditions and denial of management positions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.*; *see id.* (collecting cases where Fourth Circuit held that working conditions were not objectively intolerable); *James*, 368 F.3d at 378 ("[M]ere 'dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994))). Notably, to establish a claim for constructive discharge, "the plaintiff must show 'something more' than the showing required for a hostile work environment claim." *Evans*, 2019 WL 4018287, at *6 (quoting *Suders*, 542 U.S. at 147); *see also Nnadozie*, 730 F. App'x at 162 ("The 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe and pervasive' standard for hostile work environment claims.").

Plaintiff rests her constructive discharge claim on her interactions with Parmer. ECF 1 at 11-12. She alleges that Parmer created intolerable working conditions by "denying [her] multiple

required trainings" and by "seriously undermin[ing] her ability to complete the PA and OPS[.]" *Id.* ¶¶ 59-60. This, in turn, "led her to reasonably believe that she would be terminated." *Id.* ¶ 61. Faced "[w]ith no alternative but termination," Short "resign[ed] to protect her name[.]" *Id.* ¶ 62.

Because these same allegations fail to allege a plausible hostile work environment claim, they *ipso facto* cannot support plaintiff's claim for constructive discharge. *Nnadozie,* 730 F. App'x at 162 ("Having failed to show hostile conditions that were severe and pervasive, [plaintiff] similarly cannot show that conditions . . . were intolerable."). But, even on their own terms, these allegations are not objectively intolerable. *See Stennis v. Bowie State Univ.*, 716 F. App'x 164, 168 (4th Cir. 2017) (affirming dismissal of plaintiff's constructive discharge claim that rested on "conclusory assertions that she received threatening and intimidating emails"); *Della J. Dumbaugh v. Univ. of Richmond*, No. 19-cv-57-JAG, 2019 WL 4307872, at *4 (E.D. Va. Sept. 11, 2019) (plaintiff failed to allege a plausible constructive discharge claim where she was "unfairly criticized," prevented "from communicating with necessary personnel," and was the target of "rude and demeaning remarks" from her boss).

And, putting aside that shortcoming, the Complaint reveals that plaintiff resigned "to protect her name" and "to avoid having a termination on her employment record." ECF 1, ¶¶ 62, 68. These self-defeating averments make clear that Short quit of her own volition, to improve her prospects of finding a new job, and not because she felt compelled to leave due to racial discrimination. Thus, I shall dismiss, with prejudice, plaintiff's claim for constructive discharge.

## IV.    Conclusion

For the reasons stated above, I shall grant the Motion (ECF 6).  An Order follows, consistent with this Memorandum Opinion.

Date:   September 24, 2019                                    _____/s/_____
                                                              Ellen Lipton Hollander
                                                              United States District Judge